UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

LARON ROSS,

        Plaintiff,

v.

ADVANCED CORRECTIONAL
HEALTHCARE, *et al.*,

        Defendants.

CAUSE NO. 3:19-CV-1195 DRL-MGG

## OPINION & ORDER

LaRon Ross claims that he was denied adequate medical care while incarcerated as a pretrial detainee at the LaPorte County Jail in 2018. Mr. Ross suffers from a seizure disorder. He says he wasn't given the proper dosage of blood pressure medication while at the jail. He experienced seizures in his cell. He was transferred to a hospital. He claims he thereafter wasn't provided with appropriate treatment upon returning to the jail.

Mr. Ross sued the jail's contracted healthcare provider (Advanced Correctional Healthcare or ACH), the LaPorte County Sheriff's Office, Dr. Michael Person, Nurse Mary Montgomery, Deputy Eric Murray, and Deputy Ethan Lonske for denying him medical care in violation of the Fourteenth Amendment to the United States Constitution. The medical defendants (ACH, Dr. Person, and Nurse Montgomery) and the law enforcement defendants (the Sheriff's Office, Deputy Murray, and Deputy Lonske) each moved for summary judgment. The court grants summary judgment in favor of each defendant, save for the Sheriff's Office.

BACKGROUND

LaRon Ross was admitted to the LaPorte County Jail on July 31, 2018 [ECF 66-9 at 12:9-13; ECF 66-2, Ex. B-1 at 7].[1] Before he was booked into the jail, law enforcement took him to the Franciscan Health Emergency Department for an evaluation because Mr. Ross had been complaining of left-sided chest pain [ECF 66-10 at 10-11]. His treatment notes report that he has a history of seizures and that "he [had] not had his seizure meds in 2 days due to being placed in jail" [*id.* 14].[2] Mr. Ross suddenly started having "seizures"[3] while at the hospital [*id.* at 15]. Once his seizure activity stopped and the nurse received his testing results, Mr. Ross was discharged to the jail [*id.*]. Dr. June Brown signed off on his medical clearance form, indicating that Mr. Ross could be admitted to the jail and that he was to take Depakote[4] as prescribed [ECF 66-2, Ex. B-1 at 14; ECF 66-10 at 11-15]. Dr. Brown's discharge medication list prescribing Depakote noted that Mr. Ross was to "CONTINUE these medications which have NOT CHANGED" [ECF 66-10 at 11-12].

Nurse Mary Montgomery assessed Mr. Ross as part of his medical intake at the jail [ECF 66-2, Ex. B-1 at 13, 16; ECF 66-2, Ex. B ¶ 3]. During this time, Nurse Montgomery was employed as a licensed practical nurse (LPN) for ACH[5] [ECF 66-2, Ex. B ¶ 2]. She observed that Mr. Ross had

---

[1] At the outset, the court notes that Mr. Ross doesn't dispute any of the facts. In response, he submitted a "Statement of Additional Facts," but not a "Statement of Genuine Disputes" as required by N.D. Ind. L.R. 56-1(b)(2) ("response brief or its appendix must include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary"). "A Statement of Genuine Disputes is a critical element of any response to a motion for summary judgment, because without it, the movant's version of the facts are accepted as undisputed." *Anchor Health Sys., Inc. v. Radowski*, 2020 U.S. Dist. LEXIS 71273, 3 (N.D. Ind. Apr. 22, 2020) (quotations omitted) (collecting cases).

[2] This note is presumably based on a statement that Mr. Ross made to the nurse. However, the record otherwise indicates that Mr. Ross wasn't admitted to the jail until July 31, 2018, the same day as this evaluation [ECF 66-9 at 12:9-13; ECF 66-2, Ex. B-1 at 7].

[3] The nurse put "seizures" in quotation marks in her treatment notes [ECF 66-10 at 15].

[4] Depakote is a medication used to treat seizure disorders. *Depakote – Uses, Side Effects, and More*, WebMD (last visited July 28, 2022), https://www.webmd.com/drugs/2/drug-1788/depakote-oral/details.

[5] ACH contracted with the LaPorte County Sheriff to provide a physician and nurses to the LaPorte County Jail [ECF 66-4 ¶ 2]. ACH also provided medical training to LaPorte County Jail officers regarding various

slurred speech and was leaning over against the wall, but then sitting up and answering questions without difficulty [ECF 66-2, Ex. B ¶ 3]. She noted his vital signs were stable, and he had no outward signs of distress [*id.*].

Nurse Montgomery contacted Dr. Michael Person regarding Mr. Ross' prescription for Depakote [*id.*]. Dr. Person was employed as a physician with ACH; he was physically at the LaPorte County Jail one day a week, but remained on-call 24 hours a day, 7 days a week for questions regarding inmates' medical needs [ECF 66-1 ¶¶ 2-3]. If at any time he was unavailable or on vacation, another ACH physician would fill in [*id.* ¶ 3; ECF 66-4 ¶ 2]. Dr. Person approved the Depakote prescription for Mr. Ross but changed it from two pills three times a day to three pills twice a day [ECF 66-2, Ex. B ¶ 3; ECF 66-1 ¶ 7]. This didn't change the total amount of Depakote that Mr. Ross was taking each day; it merely changed the number of times per day the medication was taken [ECF 66-1 ¶ 7]. Mr. Ross was placed on medical observation at the jail due to his report of seizures [*id.*].

On August 1, 2018, Deputy Melissa Jackson conducted a medical intake screening with Mr. Ross [ECF 66-2, Ex. B-1 at 23-24]. She noted that Mr. Ross had seizures while in the hospital, that he was taking Depakote, and that he was being treated for his seizures [*id.* 23]. As of August 1, 2018, Mr. Ross remained in medical observation due to his report of seizures [*id.* 26]. That same day, Dr. Person ordered a one-time dose of Clonidine[6] for Mr. Ross [*id.* 94]. On August 2, 2018, Dr. Person prescribed 0.2 mg Clonidine for Mr. Ross to be taken twice a day for 90 days [*id.*]. Mr. Ross' medical administration record shows he received his Depakote and Clonidine every day in August 2018 [*id.*].

On September 4, 2018, Nurse Montgomery conducted Mr. Ross' medical history and health appraisal, also known as the 14-day assessment [*id.* 98-99; ECF 66-2, Ex. B ¶ 4]. As part of that

---

medical issues, including passing medications, assessing patients, and recognizing signs and symptoms of various illnesses, particularly drug and alcohol withdrawal [*id.* ¶ 3].

[6] Clonidine is used to treat high blood pressure. *Clonidine (Oral Route)*, Mayo Clinic (last visited July 28, 2022), https://www.mayoclinic.org/drugs-supplements/clonidine-oral-route/description/drg-20063252.

3

appraisal, Mr. Ross reported being under the care of a neurologist, primary care physician, and physical therapist [ECF 66-2, Ex. B-1 at 98]. Mr. Ross stated that he had been taking Lisinopril[7] 20 mg for his blood pressure [*id.*]. That same day, Nurse Montgomery completed a nursing progress note for Mr. Ross, which noted his complaints of jock itch and athlete's foot and that he had a blood pressure of 162/97 [*id.* 101]. Nurse Montgomery contacted Dr. Person and obtained orders for Tylenol 500 mg twice a day for 30 days, Tolnaftate cream[8] twice a day for 14 days, and Lisinopril 20 mg [*id.*; ECF 66-1 ¶ 9]. Dr. Person reviewed Nurse Montgomery's 14-day assessment of Mr. Ross and signed it on September 6, 2018 [ECF 66-2, Ex. B-1 at 99].

On September 6, 2018, Dr. Person examined Mr. Ross after his placement on suicide watch because he had threatened self-harm [*id.* 106; *see also* ECF 66-1 ¶ 10]. Mr. Ross was clear and coherent during the conversation [ECF 66-2, Ex. B-1 at 106]. He stated he was stressed from his recent changes and denied any current thoughts of self-harm [*id.*]. Dr. Person discussed the use of medication for mood stabilization, but Mr. Ross declined [*id.*]. Dr. Person confirmed that Mr. Ross could be stepped down from suicide watch [*id.*].

On September 9, 2018, Mr. Ross' blood pressure was 180/150 [*id.* 180]. Dr. Person ordered daily blood pressure checks through September 11, 2018 [*id.*]. On September 11, 2018, Mr. Ross submitted a medical request complaining of back pain [*id.* 108]. Later that day, Mr. Ross submitted another medical request, alerting the staff that he is epileptic and requesting to speak with the doctor [*id.* 109]. He said he had been letting every nurse know how he had been feeling ("arm is going numb, [dizzy] spells, and s[e]izure in my sleep") [*id.*]. He also noted that his blood pressure had been checked on at least three occasions and that he was told that blood work would have to be done for the issue

---

[7] Lisinopril is also used to treat high blood pressure. *Lisinopril – Uses, Side Effects, and More*, WebMD (last visited July 28, 2022), https://www.webmd.com/drugs/2/drug-6873-9371/lisinopril-oral/lisinopril-oral/details.

[8] Tolnaftate cream is used to treat fungus infections. *Tolnaftate (Topical Route)*, Mayo Clinic (last visited July 28, 2022), https://www.mayoclinic.org/drugs-supplements/tolnaftate-topical-route/description/drg-20068886.

to be looked into more [*id.*]. On September 14, 2018, medical staff entered responses to each of his requests [*id.* at 108-09]. As to the first request, he was given back exercises [*id.* 108]; and as to the second request, he was informed that he was scheduled for his next doctor call [*id.* 109].

The same day that Mr. Ross submitted these requests (September 11), Nurse Montgomery visited him and made a medical progress note [*id.* at 110]. She noted that Mr. Ross said, "I think I had a seizure this morning and I woke up and I had went on myself" [*id.*]. Mr. Ross' blood pressure was 180/120 [*id.*]. His pulse was 80, and his respiratory rate was 18 [*id.*]. Nurse Montgomery notified Dr. Person of Mr. Ross' blood pressure reading, his current orders for Clonidine and Lisinopril, and Mr. Ross' concern of possibly having had a seizure that morning [*id.*]. Dr. Person then increased Mr. Ross' Lisinopril to 20 mg twice a day [*id.*; ECF 66-2, Ex. B ¶ 5].

Dr. Person once more ordered daily blood pressure checks from September 15, 2018 through September 17, 2018 [ECF 66-2, Ex. B-1 at 182]. On September 15, Mr. Ross' blood pressure was 148/88 [*id.*]. The next day, Mr. Ross asked Nurse Montgomery to check his blood pressure because he believed it was elevated [ECF 66-2, Ex. B ¶ 6]. His blood pressure at that time was 158/102 [*id.*; ECF 66-2, Ex. B-1 at 182]. Nurse Montgomery gave Mr. Ross his prescribed medications and encouraged him to lay down and rest [ECF 66-2, Ex. B ¶ 6]. She said she would check him later [*id.*].

Nurse Montgomery checked on Mr. Ross later that day at 4:39 p.m., and he complained of right arm pain and numbness [*id.*]. Nurse Montgomery took Mr. Ross' vital signs [*id.*]. His blood pressure was 180/122, which was elevated [*id.*; ECF 66-1 ¶ 12]. His pulse (67), respiratory rate (18), and oxygen saturation (97 percent) were all within normal range [ECF 66-2, Ex. B ¶ 6; ECF 66-1 ¶ 12]. Nurse Montgomery contacted Dr. Person regarding Mr. Ross' complaints of right arm pain and numbness and the results of her blood pressure checks [ECF 66-2, Ex. B ¶ 6; ECF 66-1 ¶ 12]. Based on Nurse Montgomery's assessment, Mr. Ross' subjective complaints, and his objective presentation, Dr. Person didn't issue any new orders because the rest of Mr. Ross' vital signs were stable and he

5

was demonstrating no outward signs of distress [ECF 66-1 ¶ 12]. Dr. Person didn't think the pain in Mr. Ross' right arm was related to chest pain, and Dr. Person didn't receive any reports that Mr. Ross was complaining of tightness in his chest [*id.*].

Based on her experience, Nurse Montgomery didn't think there was any reason to send Mr. Ross to the emergency room [ECF 66-2, Ex. B ¶ 6]. She said that, though his blood pressure was elevated, the rest of his vital signs were stable, and he showed no outward signs of distress [*id.*]. Mr. Ross didn't complain of any chest pain or tightness in his chest [*id.*]. He also wasn't exhibiting any seizure activity when she saw him on September 16 [*id.*].

At approximately 4:53 p.m. on September 16, Mr. Ross submitted a medical request stating that he hadn't been feeling well and that he had complained to the nurse about his pain [ECF 66-2, Ex. B-1 at 112]. At 5:06 p.m., he submitted a pre-grievance request and said he had made numerous attempts to be seen by the doctor about his blood pressure and he felt like his condition wasn't being taken seriously [*id.* 113].

At approximately 7:43 p.m., an unknown inmate reported to jail staff that Mr. Ross had a possible seizure and fell over hitting his head on the floor [*id.* 116]. Deputy Chad Stewart called a possible medical emergency, and other jail staff arrived on the floor to assist [*id.*]. Sergeant Jeffrey Holt had main control call for EMS [*id.*]. EMS arrived on the floor and escorted Mr. Ross to LaPorte Hospital by ambulance [*id.*].

Mr. Ross' medical administration record shows that he received his Depakote and Clonidine every day in September 2018 until his transfer to LaPorte Hospital [*id.* 180]. Additionally, once Dr. Person ordered Lisinopril for Mr. Ross, he received that medication every day from September 5 until his transfer to the hospital [*id.* 180-82]. Mr. Ross testified that he had been taking his seizure medication every day since he had been at the jail before he went to LaPorte Hospital [ECF 66-9 at 27:20-24].

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

Mr. Ross alleges violations of his constitutional rights under 42 U.S.C. § 1983. Section 1983 serves as a procedural vehicle for lawsuits "vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To establish a § 1983 claim, he must show that he was "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). He may bring a § 1983 claim only against those individuals "personally responsible for the constitutional deprivation." *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002).

As a pretrial detainee, Mr. Ross' failure to provide medical care claims are governed by the Fourteenth Amendment instead of the Eighth Amendment. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). Accordingly, the court applies the "objective unreasonableness" standard instead of the "deliberate indifference" standard. *Id.* Indeed, a pretrial detainee like Mr. Ross cannot be punished at all, which the Eight Amendment allows for prisoners, much less can he be punished "maliciously and sadistically." *Kingsley*, 576 U.S. at 400-01.

The objective unreasonableness inquiry involves two steps. *See McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018). The first step "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *Id.* (citation omitted). Negligence or even gross negligence won't suffice. *Id.* The second step asks whether the challenged conduct was objectively reasonable. *Id.* This step requires the court "to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.*

Before recovering on these claims, Mr. Ross must present "verifying medical evidence that the delay in medical care caused some degree of harm," which may come in the form of expert testimony or medical records. *Miranda*, 900 F.3d at 347; *see also Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008); *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007).

A. *Dr. Person.*

Mr. Ross seeks to hold Dr. Person liable for his conduct before the first seizure on September 16 and for his conduct leading up to Mr. Ross' transfer to the Marion County Jail on October 26. As to each of these periods of time, Dr. Person didn't act purposefully, knowingly, or recklessly when he considered the consequences of handling Mr. Ross' case, nor was his conduct objectively unreasonable. *See McCann*, 909 F.3d at 886.

With respect to Dr. Person's conduct before September 16, Mr. Ross suggests that Dr. Person acted in an objectively unreasonable way because he failed to treat Mr. Ross. To the contrary, the record shows that Dr. Person attended to Mr. Ross' needs by issuing treatment orders, which were then carried out by Nurse Montgomery or other medical staff. As the primary care physician at the jail, Dr. Person prescribed medication and medical treatment for patients but had no personal involvement in the dispensing of medication [ECF 66-1 ¶ 3]. On the day that Mr. Ross arrived at the jail, Dr. Person approved his prescription for Depakote, an anti-seizure medication [*id.* ¶ 7]. Soon after that, Dr. Person placed orders for Clonidine, a high blood pressure medication [*id.* ¶ 8]. After Nurse Montgomery's 14-day assessment of Mr. Ross, where Mr. Ross said he had been taking Lisinopril for his high blood pressure, Dr. Person ordered Lisinopril (among other medications) [*id.* ¶ 9].

Mr. Ross says Dr. Person didn't try to assist him after his blood pressure continued to spike while taking his medication. This isn't supported by the record. On September 9, Dr. Person ordered daily blood pressure checks for three days [*id.* ¶ 11]. On September 11, Nurse Montgomery reported an elevated blood pressure reading, and Dr. Person then increased Mr. Ross' Lisinopril dosage [*id.*]. On September 16, Nurse Montgomery reported another elevated blood pressure reading [*id.* ¶ 12]. Dr. Person considered this reading but didn't issue any new orders because the rest of Mr. Ross' vital signs were stable, Mr. Ross was demonstrating no outward signs of distress, and Dr. Person didn't receive any reports of tightness in the chest [*id.* ¶ 12].

Though Dr. Person made an intentional decision not to issue any new orders following Nurse Montgomery's assessment on September 16, nothing shows that he foresaw or ignored the potential consequences of this decision—that Mr. Ross may suffer from a seizure episode. *See McCann*, 909 F.3d at 886-87. Mr. Ross argues that Dr. Person's lack of assistance forced him to endure excruciating pain and suffer a massive seizure, but he doesn't offer any evidence to show that Dr. Person purposefully,

9

knowingly, or recklessly put Mr. Ross through these consequences. Negligence, even if it could be characterized that way, isn't enough under the law.

Dr. Person explained why he didn't issue any new orders for Mr. Ross on September 16 [ECF 66-1 ¶ 12]. Based on the record, a reasonable jury couldn't find that this decision was objectively unreasonable. Indeed, Dr. C. Renee FallHowe, a board-certified family physician who practiced correctional medicine from 1997 through 2018 [ECF 66-5, Ex. D-1 at 7-8], opined that the medical services provided to Mr. Ross at the LaPorte County Jail were within the prevailing standards of care [ECF 66-5, Ex. D at 1]. Dr. FallHowe specifically said that, when Dr. Person was called about Mr. Ross' elevated blood pressure, Dr. Person ordered appropriate medications and the jail staff appropriately monitored Mr. Ross' blood pressure [*id.*]. Mr. Ross hasn't challenged Dr. FallHowe's credibility or her opinions. Nor has Mr. Ross offered any medical evidence or expert testimony that would cut against Dr. FallHowe's opinions. *See Miranda*, 900 F.3d at 347. Mr. Ross argues that he suffered unnecessary pain because Dr. Person unreasonably delayed sending him to the hospital, but Mr. Ross hasn't provided any medical support for this theory. His speculation doesn't create a genuine issue of fact. *See McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) ("mere speculation or conjecture will not defeat a summary judgment motion") (citation and internal quotation marks omitted).

The result is no different when examining Dr. Person's conduct leading up to Mr. Ross' transfer to the Marion County Jail on October 26. Mr. Ross was returned to the jail after his first seizure episode on October 1, but he wasn't transferred to an infirmary until October 26. Mr. Ross argues that Dr. Person's conduct was objectively unreasonable because Dr. Person knew that Mr. Ross required infirmary-level care and that the LaPorte County Jail didn't have an infirmary. Though Dr. Person could make the recommendation or suggestion, he didn't have the authority to decide whether to transfer Mr. Ross to another jail [ECF 66-1 ¶ ¶ 20]. Thus, he wouldn't be personally responsible

for any constitutional violation stemming from a delay in Mr. Ross' transfer to another jail. *See Doyle*, 305 F.3d at 614.

Aside from that, Mr. Ross argues that Dr. Person ignored his complaints of pain and dizziness leading up to the second seizure. He says it was Dr. Person's responsibility to provide him with some sort of treatment. Once again, Mr. Ross' argument isn't supported by the record. When Mr. Ross returned to the LaPorte County Jail on October 1, Dr. Person approved several prescriptions for him [ECF 66-1 ¶ 13]. He examined Mr. Ross on October 4 [*id.* ¶ 14]. Dr. Person's plan was to continue with the medications and have Mr. Ross evaluated by speech therapy and physical therapy [*id.*]. Dr. Person understood that Mr. Ross would be scheduled for these evaluations [*id.*], thus undercutting the notion that Dr. Person willfully refused to provide him with treatment. Dr. Person examined Mr. Ross again on October 11 and on October 25 [*id.* ¶¶ 15, 19]. In the interim, Dr. Person received reports about Mr. Ross' condition; he didn't issue any new orders based on these reports, but he indicated that the jail staff should continue to observe Mr. Ross [*id.* ¶¶ 16-17].

In building on this argument that Dr. Person ignored him, Mr. Ross says, "Dr. Person literally hung up on them [a correctional officer] when they requested his medical direction. This is the height of objective unreasonableness" [ECF 75 at 9]. In his statement of additional facts, Mr. Ross says that Dr. Person hung up on a correctional officer on October 14 and again on October 19 [ECF 73 at 7, 11]. He cites incident reports from the jail [*id.*]. In the October 14 incident report, Deputy Misty Rikard reported that she "called Dr. Person and provided him with all the information [she] had and Dr. Person stated to do nothing but keep an eye on him and let him know if there are any changes." [ECF 73-13 at 7]. This is consistent with Dr. Person's testimony [ECF 66-1 ¶ 16]. In the October 19 report, Deputy Eric Murray reported that he "contacted Doctor Michael Person via telephone which took multiple times for a response. Doctor Person was very unprofessional in his response as if [Deputy Murray] was wasting his time and he stated I have nothing for him and Doctor Person hung up" [ECF

11

73-13 at 11]. Dr. Person said that Deputy Murray contacted him twice in the evening on October 19 regarding Mr. Ross and that, based on the information provided to him by Deputy Murray and Mr. Ross' subjective complaints, Dr. Person didn't issue any new orders and jail staff was to continue to observe Mr. Ross [ECF 66-1 ¶ 17].

Even when construing the facts in Mr. Ross' favor, and assuming that Dr. Person was unprofessional on the phone and hung up on Deputy Murray, the record doesn't support the conclusion that Dr. Person did so purposefully, knowingly, or with reckless disregard to the fact that Mr. Ross may then suffer another seizure episode. *See McCann*, 909 F.3d at 886-87. Deputy Murray apprised Dr. Person of Mr. Ross' complaints; based on this information, Dr. Person didn't find it appropriate to issue any new orders [ECF 66-1 ¶ 17]. Based on Deputy Murray's account, before Dr. Person hung up, he said, "I have nothing for him" [ECF 73-13 at 11].

Mr. Ross suggests that it was objectively unreasonable for Dr. Person not to take any action at this time. But once again, Dr. FallHowe opined that Dr. Person's treatment of Mr. Ross was consistent with the prevailing standards of care [ECF 66-5, Ex. D at 1]. She specifically said that, after Mr. Ross' return to the jail following his hospitalization, "Dr. Person ordered appropriate medications for Mr. Ross' conditions and nursing staff and jail staff monitored Mr. Ross appropriately and quite frequently" [*id.* at 2]. Again, Mr. Ross hasn't refuted Dr. FallHowe's opinions, nor has he offered any medical evidence or expert testimony that would cut against these opinions. *See Miranda*, 900 F.3d at 347. Therefore, based on this record, a reasonably jury couldn't find that Dr. Person's conduct was objectively reasonable. The court thus grants summary judgment in his favor.

B.     *Nurse Montgomery.*

Mr. Ross additionally seeks to hold Nurse Montgomery liable for her conduct before the first seizure on September 16. Like Dr. Person, Nurse Montgomery didn't act purposefully, knowingly, or

12

recklessly when she considered the consequences of handling Mr. Ross' case, nor was her conduct objectively unreasonable. *See McCann*, 909 F.3d at 886.

Mr. Ross argues that Nurse Montgomery's conduct was objectively unreasonable because she testified that an individual should be monitored when he is experiencing a blood pressure spike, yet when this happened to Mr. Ross, she left him unattended and went home. He says Nurse Montgomery knew that Mr. Ross needed care and didn't provide it. Nurse Montgomery agreed that when someone has a blood pressure of 180 over 150, that needs to be monitored until it drops back down to normal range [ECF 73-4 at 76:7-10]. She acknowledged that Mr. Ross' blood pressure on September 16 was 180 over 122 and that this was an elevated reading [*id.* 79:15-24]. But she said in this instance, given the elevated blood pressure and the pain in Mr. Ross' right arm, it wasn't a medical emergency because the pain in the right arm wouldn't be related to chest pain [*id.* 83:12-84:4]. She notified Dr. Person of the blood pressure reading, and Dr. Person didn't tell her to monitor his blood pressure until it went down [*id.* 86:25-87:7]. Nurse Montgomery left for the day once her shift ended [*id.* 86:19-22]. After she left, there was no other nurse at the facility [*id.* 89:9-14].

Mr. Ross appears to argue that Nurse Montgomery left for the day knowing that Mr. Ross would then suffer a seizure episode and require hospitalization. The record doesn't support this conclusion. Nurse Montgomery didn't believe the situation was a medical emergency [*id.* 83:12-84:4]. Dr. Person didn't tell her to continue monitoring Mr. Ross; instead, he said he would follow up with him at the next doctor call [*id.* 87:5-7, 87:24-88:3]. *See McCann*, 909 F.3d at 887 (not the responsibility of the nurse to second-guess the doctor's medical judgment, especially when nothing about the doctor's course of care generally raises any obvious risks of harm). Even if it could be said that Nurse Montgomery knew she should continue monitoring Mr. Ross' blood pressure in spite of Dr. Person's order otherwise, there's no evidence to suggest that she knew her failure to continue monitoring him would result in a seizure episode.

13

A reasonable jury couldn't find that Nurse Montgomery's conduct was objectively unreasonable. Dr. FallHowe opined that the "staff at the jail appropriately monitored [Mr. Ross'] blood pressure" [ECF 66-5, Ex. D at 1]. She specifically stated that "[t]he actions of Nurse Mary Montgomery were reasonable and appropriate. She communicated necessary information to Dr. Person at the appropriate times and appropriately followed the provider's orders" [*id.*]. She also explained, "An elevation of the blood pressure numbers does not in and of itself diagnose a crisis. Mr. Ross's seizure activity pattern was not consistent with the neurologic changes seen in hypertensive encephalopathy with seizures" [*id.*]. As before, Mr. Ross hasn't challenged these opinions, nor has he offered his own evidence to contradict them. *See Miranda*, 900 F.3d at 347. Summary judgment is thus appropriate on his claim against Nurse Montgomery.

Mr. Ross generally argues that the medical staff acted unreasonably when he was returned to the jail on October 1, but he doesn't specifically argue how Nurse Montgomery acted unreasonably in any way during this period of time. Dr. FallHowe said that, when Mr. Ross returned to the jail following his hospitalization, medical staff (including Nurse Montgomery) acted reasonably and appropriately with regards to his medical care [*id.* 2]. So even had Mr. Ross made this argument, it wouldn't preclude summary judgment as to Nurse Montgomery.

  C. *Advanced Correctional Healthcare.*

ACH argues that no policy, custom, or procedure existed that denied inmates at the LaPorte County Jail medical treatment for their serious medical needs. ACH says Mr. Ross hasn't come forward with any evidence to support a *Monell* claim against it. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). In response, Mr. Ross says ACH is responsible for his constitutional injuries because the LaPorte County Jail was understaffed with medical personnel. But even Mr. Ross acknowledges that the medical staffing levels at the jail were determined by the jail's contract with ACH. Indeed, Dr. Jillian Bresnahan, the Vice President of Medical Operations at ACH, explained that the medical

staffing levels depended on the contract with the jail [ECF 66-4 ¶¶ 1-2]. He doesn't argue that ACH wasn't fulfilling its contractual duties.

In reply, ACH says that Mr. Ross' argument against it is undeveloped and doesn't contain any factual support. *See Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010) (quoting *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002)) ("not this court's responsibility to research and construct the parties' arguments"). The court agrees, particularly in light of the fact that the LaPorte County Jail had the responsibility to bargain for the appropriate amount of medical staffing, and it was only ACH's responsibility to fulfill these needs. As to staffing, the jail had the final policymaking authority. *See Est. of Moreland v. Dieter*, 395 F.3d 747, 758-59 (7th Cir. 2005). And as ACH points out, there isn't evidence that it knew of a series of incidents where inmates were denied appropriate medical care. *See Hahn v. Walsh*, 762 F.3d 617, 637 (7th Cir. 2013). The court thus grants summary judgment in favor of ACH.

D.   *LaPorte County Sheriff's Office.*

Mr. Ross argues that the jail's understaffing was the moving force behind the constitutional violations.[9] He seeks to hold the Sheriff's Office liable in this regard, claiming it was its systemic deficiencies in staffing that harmed him. In reply, the Sheriff's Office says this argument fails because Mr. Ross hasn't provided any evidence that his constitutional rights were violated or that the alleged understaffing was the reason for the alleged constitutional violations.

---

[9] In its summary judgment motion, the Sheriff's Office says Mr. Ross is attempting to hold it liable for the clinical treatment and judgment of ACH employees [ECF 68 at 13]. But in response, Mr. Ross solely argues that it was the Sheriff's Office practice of understaffing the jail that caused the constitutional violation [ECF 75 at 10-12]. Therefore, any argument that the Sheriff's Office should be liable for the allegedly inadequate medical judgment of the healthcare providers has been abandoned or waived. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) ("Failure to respond to an argument generally results in waiver[.]"). And even had Mr. Ross pressed that argument, it would lose in the face of Dr. FallHowe's unrefuted opinion that all medical services provided to Mr. Ross while at the LaPorte County Jail were within the prevailing standards of care [ECF 66-5, Ex. D at 1].

15

A government entity is legally responsible for a constitutional violation only when its policies, practices, or customs caused the violation. *Monell*, 436 U.S. at 694. To recover on his *Monell* claim, Mr. Ross must establish that (1) he suffered a deprivation of a federal right (2) as a result of an express municipal policy, a widespread custom, or a deliberate act of a decisionmaker with final policymaking authority for the municipality that (3) was the proximate cause of his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014).

There are three instances when government entities are liable: "(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a wide-spread practice that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with final decision policymaking authority." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). Mr. Ross doesn't explicitly say which instance applies here, though he seems to argue that it was the Sheriff's express policy on staffing levels that caused the constitutional deprivation (that is, the first type of instance) [ECF 75 at 12].

The Sheriff's Office argues that Mr. Ross hasn't proffered any evidence to show that he suffered any constitutional harm as a result of the staffing policy. Mr. Ross responds that he suffered from unconstitutional conditions of confinement when he was returned to the jail on October 1. As he points out, inmates must be provided with "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Adequate medical care is but one of the humane conditions of confinement that must be ensured. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "The rights . . . to have enough water for drinking and sanitation, and not to be forced to live surrounded by [one's] own and others' excrement—are [also] clearly established." *Hardeman v. Curran*, 933 F.3d 816, 821 (7th Cir. 2019).

16

When Mr. Ross returned to the jail on October 1, he was placed in a "suicide" cell. Nurse Montgomery was made aware that he needed assistance to use the bathroom and that he was given a bedpan. Mr. Ross required bed baths and was given Depends. He couldn't feel when he had bowel movements coming. The medical staff left during the late afternoon, which meant that Mr. Ross had to sit in his own feces until the next morning when they were back on shift. Mr. Ross at times laid in his own urine and feces for days. He filed a grievance complaining that the jail and nursing staff were failing to keep him cleaned. On October 16, an officer was ordered to clean Mr. Ross' mattress due to it being soiled. The mattress was completely soaked with urine; there were multiple stain rings; and urine was dripping off it. That day, he filed another grievance complaining about not being cleaned, being forced to lay on a soiled mattress, and getting bumps on his backside from having to lay in a soiled mattress. On October 19, he was found crying and screaming in his cell after he fell out of his bed while trying to clean excrement off himself. He says the only time effort was made to clean him and his room was when his attorney was coming. On October 26, Mr. Ross was transferred to the Marion County Jail because he required infirmary-level care and the LaPorte County Jail didn't have an infirmary.

The Sheriff's Office offers a different record, but resolving the factual discrepancies is for the jury here. Construing these facts in the light most favorable to Mr. Ross, a reasonable jury could find that he was denied the minimal civilized measure of life's necessities by having to live in his own excrement for days, whether one cognizes this as a denial of medical care or more generally as a condition of his confinement. *See Farmer*, 511 U.S. at 32. What's more, a reasonable jury could decide that, had the jail been better staffed (particularly through the overnight hours), this problem could have been avoided. Mr. Ross has claimed injuries resulting from this condition (for instance, bumps on his back from having to lay on a soiled mattress). One might think that the harm wasn't caused by the understaffing at the jail but instead by the Sheriff's decision not to transfer him to an infirmary

sooner. But these two arguments are really one in the same in operation. Mr. Ross required infirmary-level staffing, and the LaPorte County Jail didn't or couldn't provide that to him—whether by way of expanding its own staff or transferring him to an infirmary.[10] Because a reasonable jury could find in favor of Mr. Ross on this claim, the court denies summary judgment for the Sheriff's Office.

    E.    *Deputy Murray and Deputy Lonske.*

Mr. Ross abandons claims against Deputy Murray and Deputy Lonske [ECF 74 at 1]. When a plaintiff abandons a claim in response to a summary judgment motion, summary judgment is properly granted for the movant. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 598-99 (7th Cir. 2003) (affirming summary judgment against an abandoned claim); *see also Little v. Mitsubishi Motors N. Am., Inc.*, 261 F. Appx. 901, 903 (7th Cir. 2008) (same). Thus, the court grants summary judgment in favor of Deputy Murray and Deputy Lonske.

    F.    *Motion to Strike.*

The defendants collectively filed a motion to strike exhibits 14 and 16 from the record, which were submitted by Mr. Ross in response to the summary judgment motions. Exhibit 14 is the 2017 annual Jail Inspection Report and exhibit 16 is an article from Prison Legal News [ECF 73-14, 73-16]. "Motions to strike are heavily disfavored, and usually only granted in circumstances [when] the contested evidence causes prejudice to the moving party." *Rodgers v. Gary Cmty. Sch. Corp.,* 167 F. Supp.3d 940, 948 (N.D. Ind. 2016); *see also Olson*, 750 F.3d at 714; *Kuntzman v. Wal-Mart*, 673 F. Supp.2d 690, 695 (N.D. Ind. 2009).

The Jail Inspection Report is specific to 2017, and Mr. Ross wasn't detained at the jail until July 2018. For this reason, it doesn't bear on the conditions at the jail at the time of his incarceration and thus isn't relevant to this case. The news article likewise isn't relevant because it relates to the

---

[10] Mr. Ross was eventually transferred to an infirmary on October 26. This doesn't do away with any damages that he suffered from October 1 through October 26.

circumstances of an entirely different case at a different point in time. Because these exhibits are irrelevant, they had no bearing on the court's rulings today. The defendants haven't otherwise shown why this evidence would cause them prejudice. The court denies the motion to strike as the evidence is immaterial to summary judgment.

## CONCLUSION

Construing all facts and reasonable inferences in favor of LaRon Ross, the court GRANTS the medical defendants' summary judgment motion [ECF 64] and the law enforcement defendants' motion as to Deputy Murray and Deputy Lonske [ECF 67], DENIES the law enforcement defendants' summary judgment motion as to the LaPorte County Sheriff's Office [ECF 67], and DENIES the motion to strike [ECF 78].

SO ORDERED.

August 17, 2022                    *s/ Damon R. Leichty*
                                   Judge, United States District Court